

A. G. FILE No.

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable John E. Taylor
Chief Supervisor
Oil & Gas Division
Railroad Commission of Texas
Austin, Texas

Dear Sir:

Opinion No. O-1845
Re:  Construction of Marginal Well
Statutes, Article 6049b, Vernon's
Annotated Texas Civil Statutes

We have your letter of January 12, 1940, asking our
opinion with reference to Article 6049b of Vernon's Annotated
Texas Civil Statutes.  After quoting this statute, you ask
our opinion with reference to the following questions:

"First.  Is the language contained in the first
paragraph of Section 1 of the Statute hereinabove
referred to merely a general clause relating to and
to be construed and applied in connection with Sections
"a", "b", "c", "d" and "e" of the Statute, or is the
language of the Statute so ambiguous as to invalidate
same in its entirety?

"Second.  (a) Does Section 2 of the Statute herein-
above referred to mean that to curtail the production of
a well below the amounts set forth in Sections "a", "b",
"c", "d" and "e" of the Statute is waste as a matter of
law?

"(b) Does the Commission have the power to
curtail the production of wells described in Sections
"a", "b", "c", "d" and "e" of the Statute, if such curtail-
ment is necessary to prevent waste as provided in other
Statutes of this State?

"Third.  If you have answered Section (a) of Question
Two in the affirmative, then please advise whether or not
the Legislature had the power to so declare and provide.

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

"Fourth. Does the Statute prohibit the Commission from restricting the production of wells of depths and having the producing capacities as set forth in Sections "a", "b", "c", "d" and "e" only when such wells would be damaged or result in loss of production ultimately recoverable or cause premature abandonment of same, if the well or well's daily production were artificially curtailed?

"Fifth. Should it be held by your Department that Article 6049b is not invalid because of any ambiguity in the language used, then is same invalid for any other reason?

"Sixth. Should it be held that Article 6049b is a valid statute, then is a finding by the Railroad Commission of Texas of facts which brings a well with any of the classifications of a marginal well final, conclusive and binding upon the Courts?

"Seventh. If Article 6049b is a valid Statute, can the Railroad Commission in a proration order fix the daily allowable of any pumping or flowing well having a potential capacity greater than that of a marginal well, under your determination of the meaning of marginal wells, below the amount allowed for a marginal well of similar depth?

"Eighth. If the language used in the Statute to the effect "The term 'marginal well' as used herein means a pumping oil well capable, under normal unrestricted operating conditions, of producing such daily quantities of oil as herein set out as would be damaged, or result in a loss of the production ultimately recoverable or cause the premature abandonment of same, if its daily production were artificially curtailed," is not so ambiguous when used in connection with the rest of the Statute so as to invalidate same in its entirety, then please advise what, in your opinion, is the precise meaning of the language quoted?"

We also have your supplemental request of January 15, 1940, in which you ask the following question:

"Nine. Does the Railroad Commission of Texas have the power under Article 6049b, Revised Civil Statutes of the State of Texas, to artificially curtail the production of a pumping well having a producing capacity of more than 20 barrels per day and producing from horizons found at a depth between 2,000 and 4,000 feet, below 20 barrels per day as set forth in Section "b" of the above referred to Article?"

Hon. John E. Taylor, Page 3

Before stating our answers to your questions, we believe that it will be helpful to set out briefly the legislative history of the "Marginal Well Statute," and the departmental and judicial construction which it has received up to this time.

The Marginal Well Statute was first enacted as Senate Bill No. 337, Acts, 42nd Legislature, Regular Session, Chapter 58, Page 92, which became effective April 16, 1931. The caption of this statute reads as follows:

"An Act to define marginal wells; declaring it to constitute waste to artificially restrict the normal production therefrom; directing that no rule or order of the Railroad Commission or other constituted legal authority shall be entered requiring the restriction of the production of any marginal well; declaring each provision independent of each other provision; and declaring an emergency."

The first two sections of Senate Bill No. 337 read as follows:

"SECTION 1. The term 'Marginal Well' as used herein means a pumping oil well producing such daily quantities of oil as herein set out as would be damaged, or result in a loss of the production ultimately recoverable, or cause the premature abandonment of same, if its daily production were artificially curtailed. The following described wells shall be deemed 'Marginal Wells' in this State:

"(a) Any pumping oil well within this State having a daily production of ten barrels or less, averaged over the preceding thirty consecutive days, producing from a depth of 2000 feet or less;

"(b) Any pumping oil well within this State having a daily production of twenty barrels or less, averaged over the preceding thirty consecutive days, producing from a horizon deeper than 2000 feet and less in depth than 3500 feet;

"(c) Any pumping oil well in this State having a daily production of forty barrels or less, averaged over the preceding thirty consecutive days, producing from a horizon deeper than 3500 feet.

"SEC. 2. To artificially curtail the production of any 'Marginal Well' below the marginal limit as set out above prior to its ultimate plugging and abandonment is hereby declared to be waste, and no rule or order of the Railroad Commission of Texas, or other constituted legal

Hon. John E. Taylor, Page 4

Section 3 of Senate Bill No. 337 declared each provision of the statute independent of each other provision and declared the legislative intent to have passed each provision independently of all other provisions. Section 4 was an emergency clause, which read as follows:

"SEC. 4. The fact that there is no law defining a 'Marginal Well' and none which prevents the artificial curtailment of the production of small pumping wells, the artificial restriction of which would cause their damage, a smaller ultimate recovery of oil therefrom and their premature abandonment, creates an emergency and an imperative public necessity requiring that the Constitutional Rule which requires bills to be read on three several days be suspended, and such Rule is hereby suspended, and that this Act take effect from and after its passage, and it is so enacted."

After the passage of the Marginal Well Statute, the Legislature enacted House Bill No. 25, Acts, 42nd Legislature, First Called Session, Chapter 26, Page 46, which became effective August 12, 1931, and most of which is now embraced in Article 6049c of Vernon's Annotated Texas Civil Statutes. Section 16 of this statute (now Section 16 of Article 6049c of Vernon's Annotated Texas Civil Statutes) contains the following provision with reference to the Marginal Well Statute:

"Nothing in this Act contained shall modify or change in any way the terms and provisions of Senate Bill No. 337, passed by the Forty-second Legislature at its regular Session, commonly known as the Marginal Well Bill."

Subsequently, the Legislature enacted Senate Bill No. 1, Acts, Fourth Called Session, Forty-second Legislature, Chapter 2, effective November 12, 1932. Section 12 of this statute contained the following provision:

". . . and this Act shall not be construed to repeal or modify Senate Bill No. 337, passed by the Forty-second Legislature, at its Regular Session, known as the Marginal Well Bill."

On January 17, 1933, the Attorney General's Department construed the Marginal Well Statute in an opinion written by Assistant Attorney General Maurice Cheek to Mr. R. D. Parker, who was then Chief Supervisor of the Oil & Gas Division of the Railroad Commission. With reference to the construction of the marginal well statute, as it then read, the opinion contained the following statement:

Hon. John E. Taylor, Page 5

"It is my opinion that under the terms of this act the Railroad Commission is expressly denied the right to pass any order which curtails the production of any marginal well below the marginal limits set out in the act. . . . . .

"This act constitutes a definite limitation on the authority of the Railroad Commission. Under its terms the Commission cannot curtail the production of a pumping oil well producing from a depth of 2000 feet or less below 10 barrels per day. It cannot curtail the production of such a well producing from a horizon deeper than 2000 feet and less than 3500 feet below 20 barrels per day, or a pumping oil well producing from a horizon deeper than 3500 feet below 40 barrels per day.

"The fact that a well is a pumping well does not withdraw from the Commission the power to curtail its production to prevent waste under the statutes down to the limits set forth. In other words, a pumping oil well is subject to the rules, regulations and orders of the Railroad Commission just the same as any other oil well in Texas, subject to the limitations imposed on the powers of the Commission by this act. The Commission may, to prevent waste, curtail the production of such wells down to the limits set forth in the act, but it may not curtail their production below the limits."

On April 1, 1933, Conference Opinion No. 2916 of the Attorney General's Department, addressed to the Railroad Commission of Texas, and written by Assistant Attorneys General Neal Powers and Maurice Cheek, was issued, containing the following statement:

"Under the marginal well law (Acts, 1931, 42nd Leg., p. 92, Ch. 56 - Now Art. 6049b, R. S.), pumping wells which produce from the horizon which exists in the East Texas field may not be curtailed by a proration order of the Railroad Commission to a daily allowable of less than forty barrels, although they may be curtailed to that figure to prevent waste."

Subsequent to the rendering of the foregoing opinions, the Legislature passed House Bill No. 878, Acts, 43rd Legislature, Regular Session, Chapter 97, Page 215, which became effective April 27, 1933. This statute amended Section 1 of the marginal well statute so as to read as follows:

Hon. John E. Taylor, Page 6

"Section 1. The term 'Marginal Well' as used herein means a pumping oil well capable, under normal unrestricted operating conditions, of producing such daily quantities of oil as herein set out as would be damaged, or result in a loss of production ultimately recoverable, or cause the premature abandonment of same, if its daily production were artificially curtailed. The following described wells shall be deemed 'Marginal Wells' in this State:

"'(a) Any pumping oil well within this State having a daily capacity for production of ten (10) barrels or less, averaged over the preceding thirty (30) consecutive days, producing from a depth of two thousand (2,000) feet or less:

"'(b) Any pumping oil well within this State having a daily capacity for production of twenty (20) barrels or less, averaged over the preceding thirty (30) consecutive days, producing from a horizon deeper than two thousand (2,000) feet and less in depth than four thousand (4,000) feet:

"'(c) Any pumping oil well within this State having a daily capacity for production of twenty-five (25) barrels or less, averaged over the preceding thirty (30) consecutive days, producing from a horizon deeper than four thousand (4,000) feet and less in depth than six thousand (6,000) feet:

"'(d) Any pumping oil well within this State having a daily capacity for production of thirty (30) barrels or less, averaged over the preceding thirty (30) consecutive days, producing from a horizon deeper than six thousand (6,000) feet and less in depth than eight thousand (8,000) feet:

"'(e) Any pumping oil well within this State having a daily capacity for production of thirty-five (35) barrels or less, averaged over the preceding thirty (30) consecutive days, producing from a horizon deeper than eight thousand (8,000) feet."

The emergency clause of House Bill 878, supra, read as follows:

"SEC. 2. The fact that the present definition of the term 'Marginal Well' operates as an impediment to the administration of the conservation laws of the State of Texas in an equitable distribution of the allowable production in the oil fields of this State creates an emergency and an imperative public necessity requiring that the Constitutional Rule which requires bills to be read on three several days be

suspended, and such Rule is hereby suspended and that this
Act take effect from and after its passage, and it is so
enacted."

On October 7, 1933, Honorable Maurice Cheek, Assistant
Attorney General, wrote a letter opinion to the Committee on
Oil & Gas of the House of Representatives of the Texas Legisla-
ture. With reference to the marginal well law, the opinion
contained the following statement:

"The marginal well law which limits the power of the
Commission to curtail the production of wells below a
certain limit is simply a limitation on the authority of
the administrative body to which has been entrusted the
duty of carrying into effect the conservation laws of this
state with reference to oil and gas. It is simply a legis-
lative declaration that, even though waste might result, if
all the wells in this state are permitted to produce at the
limits set by the marginal well law, that nevertheless that
rate of production will not be unlawful and operators can
conduct their operations accordingly without fear of inter-
ference from the Railroad Commission.

"Specifically answering your inquiry, the Legislature
has the power to fix the limits of production of marginal
wells at any point that it sees fit, since the marginal well
law is a limitation not on the rights of the operator but
on the powers of the Commission. This, of course, is not
the same as saying, assuming that there were no marginal
well laws, that an order of the Commission curtailing the
production of wells to a ridiculously low limit would be
a valid order. In that case the order of the Commission
would be unconstitutional as depriving the operator of his
property without due process of law; but the limits which
are set on the authority of the Commission by the Legisla-
ture in a law of this character are solely within the
discretion of the Legislature and the courts will not
distubb such a law, however much they may strike down an
order of the Commission which unreasonably curtails the
production of operators beyond the necessities of the
prevention of waste."

House Bill No. 782, 44th Legislature, Regular Session,
Chapter 76, Page 180, effective April 13, 1935, contained a
number of amendments to the statutes providing for the regula-
tion of the production of oil and gas by the Railroad Commission.
This statute also contained two express provisions with reference
to the marginal well statute. Section 2, which amended Article
6014 of the Revised Civil Statutes, contained the following
provision:

"Nothing in this Section shall be construed to authorize limitation of production of marginal wells, as such marginal wells are defined by Statute, below the amount fixed by Statute for such wells."

Section 18 of House Bill No. 782, supra, which is now contained in Vernon's Annotated Texas Civil Statutes as Section 18 of Article 6049e, contained the following provisions:

". . . and this Act shall not be construed to repeal or modify Chapter 97, Acts of the Forty-third Legislature, Regular Session known as the 'Marginal Well Act.'"

The foregoing statutes contain all of the amendments and references to the Marginal Well Statute up to the present time, contained in any legislative enactments.

There has been only one reference to the marginal well statute in any Texas case, such reference being contained in the decision of the Court of Civil Appeals at Austin in the case of Tide Water Associated Oil Company v. Railroad Commission, 120 S. W. (2d) 544. This decision does not undertake to construe the Marginal Well Statute, except to refer to "the fact that the Legislature itself has taken cognizance (see Art. 6049b, Vernon's R. C. S. as amended) that a differentiation should be made between marginal wells and the more productive areas of a field. ..."

The marginal well statute has also been referred to by the Federal Courts in the Rowan & Nichols case. In the opinion in the District Court, Rowan & Nichols Oil Company v. Railroad Commission of Texas, Judge McMillan said (28 F. Supp. 131, 136, 137)

"Respondents, in an effort to extenuate the inequality of their order, suggest the difficulty presented by the marginal well law. Article 6049b, Vernon's Ann. Civ. St. Tex. This Act relates to pumping wells and so far as East Texas is concerned forbids the artificial curtailment of production below 20 barrels a day if such reduction would cause damage to the well, or loss of ultimate recovery, or premature abandonment.

. . . . .

". . . The Statute offers no excuse for a flat 20 barrel allowance to other wells running up to 860 barrels per hour.

. . . . .

"If it be conceded that the Statute is valid (which has been seriously questioned) and that these strictly marginal wells must be allowed 20 barrels a day if they can make it, still that furnishes no excuse for confiscating the property of some other producer better situated.

Pumping wells of this variety might appear in a field to such an extent as to exhaust the entire allowable, thereby leaving nothing for high potential flowing wells. No such absurd result was ever intended. This Statute was obviously designed to keep these small pumpers from being slighted off, it being contemplated that the better wells would have a much higher allowable. If, however, this marginal minimum must be considered as a component element of a proration scheme, thereby unreasonably reducing the allowables of other better wells, either the Statute or the scheme must fall."

In Railroad Commission of Texas v. Rowan & Nichols Oil Co., 107 F. (2d) 70, Judge Foster of the Circuit Court of Appeals said, with reference to the Marginal Well Statute:

"The 451 wells referred to in the stipulation as allowed to produce all they can may properly be classed as marginal wells under the terms of a Texas statute, Art. 6049b, Vernon's Ann. Civ. Stat., which, inter alia, defines a marginal well as any pumping well having a daily output of production of 20 barrels or less. The statute prohibits the Railroad Commission from restricting the production of any marginal well as thereunder defined.

. . . . .

". . . . Flowing wells producing 20 barrels of oil a day or less could not be considered as marginal wells coming within the mandatory terms of the statute. The Commission is without authority to so class them."

With reference to the Marginal Well Statute, the Railroad Commission has adopted its Rule No. 3 under its general State-wide Rules, which reads as follows:

"3. MARGINAL WELL EXEMPTION. — No rule herein adopted shall be construed as impairing or in anywise abrogating what is known as the 'Marginal Well Law,' and each well producing oil shall be entitled to produce without restriction the amount of oil fixed by law for its classification upon the basis of depth."

Bearing in mind the foregoing statutes, and the departmental and judicial constructions which have been placed upon the Marginal Well Statute, we shall proceed to answer your questions. In doing so, we will, of course, limit our opinion strictly to a discussion of the legal questions involved, since all questions of policy are outside of our province and rest solely within the proper discretion of the Legislature and the Railroad Commission.

FIRST. Our answer to your first question is that in our opinion all of the Marginal Well Statute should be construed together and that the language of the statute is not so ambiguous as to invalidate it.

In construing Article 6049b, we have followed certain well recognized general principles of statutory construction. Primarily, we have kept in mind the rule that no statute should be held to be invalid or inoperative because of ambiguity or for any other reason unless there is no reasonable construction which can be adopted which would make the statute valid and effective. See Yett v. Cook, 115 Tex. 205, 281 S. W. 837; 39 Tex. Juris. 206. In construing a statute, the intention of the Legislature is to be arrived at by "viewing the act as a whole, from caption to emergency clause." Spears v. San Antonio, 110 Tex. 618, 625; 223 S. W. 166. Our Supreme Court has declared that, "It is the intention of the law which is the law; and once truly ascertained, it should prevail, even against the strict letter of the law," Walker v. Haley, 110 Tex. 50, 214 S. W. 295, and that the court will "not apply strict grammatical rules in interpreting statutes, when to do so would violate the evident legislative intent." Popham v. Patterson, 121 Tex. 615, 51 S. W. (2d) 680.

Section 6 of Article 10 of the Revised Civil Statutes provides that, "In all interpretations, the court shall look diligently for the intention of the Legislature, keeping in view at all times the old law, the evil and the remedy." Our Supreme Court has further said that, "Once the legislative intent is ascertained the duty of the court is plain. To refuse to enforce statutes in accordance with the true intent of the Legislature is an inexcusable breach of judicial duty, because an unwarranted interference with the exercise of lawful, legislative authority." Love v. Wilcox, 119 Tex. 256, 276; 28 S.W. (2d) 515.

Bearing in mind the foregoing cardinal rules of statutory construction, it is our opinion that the language of Article 6049b, while it is not perfectly clear and unambiguous, is sufficiently plain to make it possible to arrive at the legislative intent. Construing all of the statute together, we think that it is reasonably plain that the intention of the Legislature in passing the Marginal Well Statute was to place definite limits upon the powers of the Railroad Commission to limit the production of oil from wells in the State of Texas. Our opinion as to the specific meaning of the statute is set out in our answers to your remaining questions, stated below.

Hon. John E. Taylor, Page 11

SECOND. (a) Our answer to the first subdivision of your second question is that Section 2 of Article 6049b, when construed together with the remaining portions of the statute, means that the Railroad Commission is prohibited by the Legislature from curtailing the production of oil from the wells coming within the classifications set forth in Section 1 of the marginal well statute. The legislative restriction upon the powers of the Railroad Commission is stated in Section 2 in two ways: first, as a declaration that it is waste to curtail artificially the production of any marginal well, and second, as an express prohibition against any rule or order of the Railroad Commission requiring restriction of the production from any marginal well.

(b) Our answer to the second subdivision of your second question is that in our opinion the Commission does not have the power to curtail the production of wells described in subsections "a", "b", "c", "d" and "e" of Section 1 of Article 6049b, even though the Commission should be of the opinion that such curtailment is necessary to prevent waste as provided in other statutes of this State.

Considering the legislative history of the marginal well statute, and the construction that it has received since its passage, it is reasonably plain that the intention of the Legislature was to designate certain classes of oil wells and to provide that the Railroad Commission should have no power to restrict the production of oil from such wells. The specific considerations that impel us to the conclusions stated above are as follows:

(1) The language of the statute itself indicates that the Legislature intended to restrict the Railroad Commission by removing from its jurisdiction the power to limit the production from marginal wells. The caption of the original marginal well statute, Senate Bill No. 337, Acts, 42nd Legislature, Regular Session, Chapter 56, Page 92, states that it is "An Act to define marginal wells; declaring it to constitute waste to artificially restrict the normal production therefrom; directing that no rule or order of the Railroad Commission or other constituted legal authority shall be entered requiring the restriction of the production from any marginal well. . ."

Hon. John E. Taylor, Page 12

Section 1 of said act then proceeds to define the term "marginal wells" by stating three different specific classifications. Section 2 contains the specific prohibitions against the restriction of the production from marginal wells by the Railroad Commission, which have been hereinbefore set forth. Section 4 of the act recites that an emergency exists because of "the fact that there is no law defining a 'marginal well' and none which prevents the artificial curtailment of the production of small pumping wells." These portions of the Marginal Well Statutes can only point to one intention, that is, an intention to prohibit any curtailment by the Railroad Commission of the production of oil from marginal wells.

See 1 Summers, "The Law of Oil and Gas" (Permanent Edition) s. 96, where, citing Article 6049b, the learned author says, "The commission is expressly denied the power to limit or prorate production of 'marginal wells.'"

The only language in the statute which might lead to a different construction is the language contained in Section 1, which refers to a marginal well as being a pumping oil well such "as would be damaged, or result in a loss of the production ultimately recoverable, or cause the premature abandonment of same, if its daily production were artificially curtailed."

Similar language is also contained in Section 4, where the Legislature says that an emergency exists because of the fact that there is no law defining a marginal well and none which prevents the artificial curtailment of the production of small pumping wells, "the artificial restriction of which would cause their damage, a smaller ultimate recovery of oil therefrom and their premature abandonment. . . ."

It has been argued that by the language quoted the Legislature intended to say that the Railroad Commission should be prohibited from limiting the production of marginal wells only where such restriction of their production would cause waste, and that if the Railroad Commission should find that in fact waste would not be caused by such restriction of production, then the Railroad Commission could limit the production from such wells. Such construction was apparently adopted by Judge McMillan in Rowan & Nichols Oil Co. v. Railroad Commission, 28 F. Supp. 131, 136, but was not followed by Judge Foster in Railroad Commission v. Rowan & Nichols Oil Co., 107 F.(2d) 70, 72.

We believe however that such construction is untenable. In the first place, it disregards the plainly expressed intention of the Legislature that the purpose of the statute is to prohibit the restriction of the production of marginal wells. In the second place, such construction would make the Marginal Well Statute practically meaningless. Even if there were no marginal well statute, the Railroad Commission clearly would have no lawful authority to restrict the production from marginal wells, or from any other wells, where such restriction would cause waste or would cause damage to such wells or result in the loss of production ultimately recoverable or in the premature abandonment of such wells. The Railroad Commission is only given power to limit production where such limitation is necessary to prevent waste, and of course it would have no power to enact a limitation which would have exactly the opposite result. The evident intention of the Legislature was to make a legislative definition of what would constitute "waste" in certain situations and thereby to place a new restriction upon the powers of the Railroad Commission, not elsewhere found in the statutes. Such intention could not be given effect unless the statute is construed to be a positive prohibition against the curtailment of the production of marginal wells.

(2) We think that it is especially significant that after the enactment of the original marginal well statute, the Legislature has definitely stated in four separate statutory provisions, which have been quoted above, that the powers of the Railroad Commission to limit production of oil should not extend to the curtailment of production from marginal wells. In fact, it appears that each time, after the passage of the original Marginal Well Statute, that the Legislature passed a new statute conferring broad powers on the Railroad Commission, the Legislature was careful to make specific provisions against any construction which would give the Railroad Commission authority to cut down the production from marginal wells. We cannot believe that the Legislature would have shown this solicitude for the Marginal Well Statute had it intended that such statute would not be a definite and positive limitation upon the powers of the Railroad Commission, not contained in other statutes.

See 1 Summers, "The Law of Oil and Gas," (Permanent Edition) s. 96, note 66, where it is said, "Denial of the commission's authority to limit and prorate production of such (marginal) wells is stated in articles 6014 and 6049c, s. 16." As we have previously pointed out, such denial is also found in Article 6049e, s. 18.

(3) The construction of Article 6049b by the Attorney General's Department has consistently been that this statute was a positive limitation upon the powers of the Railroad Commission. The relevant portions of the former opinions of this Department which have considered the question have been quoted above and need not be repeated here. These former opinions contain clear and definite statements of the interpretation which is adopted in this opinion. Such consistent departmental interpretation is in itself highly persuasive. Federal Crude Oil Company v. Yount-Lee Oil Company, 122 Tex. 21, 52 S. W. (2d) 56; Moorman v. Terrell, 109 Tex. 173, 202 S. W. 727. In addition to the construction of this statute in the opinions of the Attorney General, we again refer to Rule No. 3 of the State Wide Rules adopted by the Railroad Co mission, which specifically provides that no rule adopted by the Commission shall be construed as abrogating the Marginal Well Law and that "each well producing oil shall be entitled to produce without restriction the amount of oil fixed by law for its classification upon the basis of depth."

THIRD. Our answer to your third question is that it is our opinion that the Legislature had the power to limit the jurisdiction of the Railroad Commission by prohibiting it from curtailing the production from marginal wells. Whether or not the legislative definition of "waste" contained in this statute conforms to the facts is immaterial, because the essence of the statute is a limitation upon the powers of the Railroad Commission, and not a regulation of private rights. The Railroad Commission has only such authority over the production of oil as is specifically vested in it by the Legislature. Article 16, Section 59a of the Constitution of Texas is merely a general declaration of policy with reference to the conservation of the natural resources of the State, and a direction that "the Legislature shall pass all such laws as may be appropriate thereto." The question of what laws shall be "appropriate" rests exclusively within the discretion of the Legislature. What laws, if any, shall be passed regulating the production of oil, and what powers, if any, shall be vested in any administrative agencies, are questions which the Legislature alone can decide. The Railroad Commission cannot exercise any power unless such power has been specifically delegated to it by the Legislature. In the case of Danciger Oil & Refining Co. v. Railroad Commission, 49 S. W. (2d) 837, 841, the court said:

"We recognize the rule that, in the regulation and control of private rights and properties of individuals by administrative agencies of the state, the interests of the individual, so far as consonant with the public welfare, should be jealously guarded and protected; and no authority not clearly delegated to such agency by the Legislature, or necessarily implied from that expressly delegated, should be sustained."

See also Commercial Standard Insurance Co. v. Board of Insurance Commissioners, 34 S. W. (2d) 343; State v. Robison, 30 S. W. (2d) 292.

Since Article 6049b is a restriction on the power of the Railroad Commission to act, there is no question but what the Legislature has the power to make such restriction.

FOURTH. Our answer to your fourth question is that the Marginal Well Statute prohibits the Railroad Commission from restricting the production of oil from wells coming within the classification set forth in the statute, and that such prohibition is not dependent upon the findings of the Railroad Commission as to whether or not such restriction would cause waste or would damage or cause the premature abandonment of such wells. The Legislature has simply taken away from the Railroad Commission any power to curtail the production of these wells, and whether or not such curtailment would cause their premature abandonment in fact is wholly immaterial. As we have previously stated, the Railroad Commission can exercise only such powers as are specifically delegated to it by the Legislature, and in this instance, the Legislature has specifically withheld this power from the Railroad Commission.

FIFTH. Our answer to your fifth question is that in our opinion Article 6049b is not invalid for any reason. You do not mention any specific constitutional objections, except the possible ambiguity of the statute, and this has been discussed under our answer to your first question. The caption of the statute appears to be sufficient, and it is well settled that the Legislature has the power under the Constitution to withhold from the Commission any powers which it deems proper to withhold. See Danciger Oil & Refining Co. v. Railroad Commission, 49 S. W. (2d) 837; Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S. W. (2d) 935, 87 S. W. (2d) 1069.

SIXTH. Our answer to your sixth question is that the findings of the Railroad Commission of Texas of facts which would bring a well within any of the classifications of a marginal well are presumptively valid; but that they are not conclusive and finally binding upon the courts, and can be

attacked by a proper appeal to the courts, where they will be sustained unless such findings are found by the courts to be without foundation in substantial evidence. Article 6049c, Revised Civil Statutes; Gulf Land Co. v. Atlantic Refining Co., 131 S. W. (2) 73.

SEVENTH. We cannot answer your seventh question categorically, except to say that the Marginal Well Statute itself does not prohibit the curtailment by orders of the Railroad Commission of the production of oil from flowing wells or from pumping wells having greater daily capacities than those specified in Section 1 of the Marginal Well Statute. It is clear that the Marginal Well Statute does not relate to flowing wells. Furthermore, under the 1933 amendment to the Marginal Well Statute, H. B. No. 878, Acts, 43rd Legislature, Regular Session, Chapter 97, Page 215, the definition of "marginal wells" is limited to pumping wells "capable, under normal unrestricted operating conditions, of producing such daily quantities of oil" as are therein specified. In sub-sections "a" through "e" of Section 1, the definition is limited to pumping oil wells having 'a daily capacity for production" of a certain number of barrels "or less," depending on the depth of the well. This language manifests an intention to define as marginal wells only those which have a maximum daily capacity of not in excess of the amounts stated, and pumping wells which have greater capacities do not come within the definition of marginal wells. This interpretation is the same as that placed on the meaning of the term, "marginal well," by both the District Court and the Circuit Court of Appeals in the Rowan & Nichols case. 28 F. Supp. 131; 107 F. (2d) 70.

Whether the Railroad Commission in a proration order can fix the daily allowable of any pumping or flowing well having a potential capacity greater than that of a marginal well, below the amount allowed for a marginal well of similar depth, will depend upon all of the relevant facts in connection with such order and its application. It may be that there will be a justification in the facts for setting the allowable for strictly marginal wells at a higher figure than the allowable assigned to pumping or flowing wells having a potential capacity greater than the marginal wells. A reasonable classification is permitted, and it has been held that the facts may justify the granting of a preference to marginal wells. Danciger Oil & Refining Co. v. Smith, 4 F. Supp. 236. In general, we believe that the Commission would be permitted to cut the allowable of other wells below the allowable assigned to strictly marginal wells, provided such action would not result in either physical waste of oil or gas, or in the confiscation of the property of

other owners. However, any classification would have to have
a reasonable factual basis, and the Commission could not arbit-
rarily favor one class as against others. Thompson v. Consol-
idated Gas Utilities Corporation, 300 U. S. 55. Furthermore,
under the decisions in the Federal Courts, the relative pro-
ducing capacities of wells within the same pool or reservoir
constitute a very important factor that must be considered in
promulgating any proration order, and there would have to be
a rational justification in the evidence before the Commis-
sion would be sustained in an order which reduced flowing wells
or strong pumping wells below the marginal allowable. See
People's Petroleum Producers, Inc. v. Sterling, 60 F. (2d) 1041;
People's Petroleum Producers, Inc. v. Smith, 1 F. Sup. 361;
Amazon Petroleum Corporation v. Railroad Commission, 5 F. Supp.
633; Boxrollium Oil Co. v. Smith, 4 F. Sup. 624; Danciger Oil
& Refining Co. v. Smith, 4 F. Supp. 236; Macmillian v. Railroad
Commission, 51 F. (2d) 400; Rowan & Nichols Oil Co. v. Railroad
Commission, 26 F. Sup. 131; Railroad Commission v. Rowan &
Nichols Oil Co., 107 F. (2d) 70.

EIGHTH. In your eighth question you asked for a
statement by us of the meaning of the Marginal Well Statute.
We have already stated our views generally, and we summarize
them as follows:

Article 6049b defines the meaning of the term "margin-
al well," according to the depth of the well and the maximum
producing capacity of the well under normal unrestricted opera-
ting conditions. The term "marginal well" is restricted to
pumping wells, and does not apply to flowing wells. The term
"marginal well" does not include all pumping wells, but only
those wells whose maximum producing capacities under normal
unrestricted operating conditions do not exceed the amounts
set forth in subsections "a" through "e" of Section 1. If a
pumping well has a maximum producing capacity in excess of the
amount set forth in Section 1, then such well is not a mar-
ginal well within the definition of the statute, and its pro-
duction can be curtailed by the Railroad Commission, providing
the Railroad Commission finds that such curtailment is reason-
ably necessary. As to wells which come within the definition
of a marginal well, the Railroad Commission is wholly without
power to limit the production of oil from such wells.

NINTH. Our answer to your ninth question, which is contained in your supplemental request dated January 15, 1940, is that the Railroad Commission, depending upon the relevant facts, may have the power to curtail artificially the production of a pumping well having a producing capacity of more than twenty barrels per day and producing from horizons found at a depth between 2000 and 4000 feet, below 20 barrels per day. Under the construction of the law which we have adopted, a well producing from this depth, and having a maximum producing capacity of more than twenty barrels per day, would not be strictly a marginal well, and the Commission is therefore not prohibited from curtailing its production, provided such curtailment is reasonably necessary under the facts. Of course, if the facts were such as to show that such curtailment would cause waste or would cause confiscation, the Commission would be without power so to curtail the production from such a well. As we have already stated in our answer to your seventh question, the relative producing capacities of wells in the same field are an important factor that must be considered in any proration order, and a proration order giving a strong pumping well a lower allowable than a marginal well would not be sustained unless it had a reasonable justification in the relevant facts.

Yours very truly

ATTORNEY GENERAL OF TEXAS

(Signed) James P. Hart

By

James P. Hart
Assistant

JPH:AMM

APPROVED JAN. 17, 1940

(Signed) Gerald C. Mann
ATTORNEY GENERAL OF TEXAS

This opinion considered and approved in limited conference.